Mr. Smith, thank you, Your Honor. Toby Smith for Ryan Taylor and Steven Smith. May it please the Court. The District Court's denials of the motions to suppress should be reversed because the FBI searched the appellant's computers without a valid warrant and could not rely in good faith on the validity of the warrant that they obtained. The District Court erred in finding good faith because when FBI agents sought approval for a novel type of search knowing that Rule 41's territorial limitations presented the greatest impediment to approval of their application, they presented a magistrate judge with a warrant application that deliberately obscured an essential fact that went to the heart of the warrant's validity, that fact being the territorial reach of the NIT search. What's the evidence, just so I'm clear, that they deliberately obscured this fact? I mean, you know, you point to language in the warrant that says that this device, this NIT, will be deployed on a server in EDVA. So maybe not quite deployed on, but deployed from. I mean, I can see, frankly, a non-technophile, even a relatively informed non-technophile thinking like, yeah, I basically got this right. And then at page, you know, in the affidavit, they sort of flesh it out and say this is how it's going to work. So what's the evidence of, like, deliberate intentional wrongdoing? So I will answer that, but I also first will say that the Court doesn't have to find deliberate misrepresentation, simply representations with reckless disregard for the truth. Right, but I mean, I'm just sort of, you said deliberate wrongdoing, so let's hear it. Right, so the warrant application opens with a prominent and simply false opening representation that this was going to be a search of property in the Eastern District of Virginia. The FBI agents who completed the application could not have helped but know that that was not true. There has been, in some other judicial opinions about this search, some emphasis placed on the fact that late in the affidavit, the FBI said that this would search computers wherever located. However, that disclosure, in addition to being, again, buried very deep in the affidavit, also did not unambiguously contradict the false opening representation that this was a within-district search. It did not ever come out and say we're actually going to search computers throughout the country and, in fact, throughout the world. And that contrasts starkly with the detailed descriptions that the warrant affidavit gave as to just about every other aspect of the search. Territorial reach was the weak point of the warrant application, and the FBI simply buried the lead. This was something they recognized as a weak point and the greatest impediment to their, I'm sorry, do you have a question, Judge Schiff? What technically was going to be placed on the server within the In Virginia, that was where they had moved the playpen site. I'm a novice, a sub-novice when it comes to all this. I'm trying to understand what we have here. In simple words, here's my understanding, and I'm probably way off. My understanding is that the FBI got the consent of the playpen in Virginia to put the virus on there. The administrator was cooperating. The administrator had been arrested, the FBI had seized the site. I understand. So they didn't need to get a warrant, as I understand it, with regard to that server, assuming that that was done with consent. Now, my next understanding is that there's an intermediary, computer or whatever it is, between that server and the ultimate user, like Mr. Taylor. Am I right? Yes, the connection was bad. So that message comes from the user's computer to the intermediary and from the intermediary to Virginia, to the server. Am I right? Yes, yes. Okay. Who controls the intermediary? No, no, no. Does the Virginia server control the intermediary? No. Well, who does? Somebody sets the intermediary up. It's either the user or... It's actually, it's my understanding, and it is factually dense, isn't it? But my understanding is that it's a chain of computers of people who voluntarily are participating in being part of the infrastructure of the... Well, I'm trying to make it simple. Just have one intermediary. So the user sends a message to the intermediary, which sends a message to the server, which doesn't disclose the of the user. Am I right so far? So far, yes. Okay. Who controls the intermediary? It's unknown. It is simply unknown. It's the Tor network routes. In other words, somebody out in the ether out there has volunteered to be the conduit? Yes, sir. But as far as I think that where your honors questions are going to is... Well, I'll tell you what. Well, let's assume that the intermediary is part of the server. Okay. Okay. In which event, it controls the intermediary. And when the user sends a message to the intermediary, it runs the risk that it might be disclosed. The... I mean, that's not the way the Tor works. No, I want to know whether I have a misunderstanding. I think so. Do you think it's important who controls the intermediary? Yes, that's the very nature of the anonymizing technology. Maybe. And you don't know who does? Correct. Well, then what expectation does the user have that this intermediary, which comes out of nowhere, could be from a planet, is going to not reveal the address? The... So the very nature of the Tor network is... I'm drawing an analogy to pen register. Okay, so this is... Let's assume for sake of discussion that the address of the user is like a phone number in a pen register setting. Okay. But we have one difference in between. In the pen register, we go straight to the telephone that's being searched, as it were. So the caller runs the risk of the telephone number being disclosed. Right. Okay, so if this is like a pen register, then you have the intermediary who's receiving the address or the phone number. Okay. And that is understood. But this is simply different. I mean, that's the... Well, then I have a total misunderstanding, and I'm open to whatever it is. The facts are very important. It is, and it's very hard to understand. But the expectation of privacy is the very essence of the Tor network. Well, you agree that somebody making a call to a pen registered number doesn't have an expectation of privacy. Sure, that's very clear in the law. Okay. Okay. Let's suppose there was no intermediary, and the number simply went to the server. No expectation of privacy. Okay, so it's all tied up then, is it not, in the intermediary situation? It is, and that's where the reasonable... And so that depends on who controls the intermediary. Well, it's not a single intermediary, and that is part of it. Well, let's assume there's just one. Okay. I mean, I don't know that there's much else I can say. Okay. You're on my nickel. I'm using up your time, and I'm sorry. No, Your Honor, I want to answer the questions that the court has. Can I ask you just one quick one just that follows on? You said in the course of that that it's factually dense and difficult to understand. Right. Does that not militate against your deliberate wrongdoing or recklessness with respect to the technology? I mean, I guess I'm just having a hard time putting this squarely in the bad faith box as opposed to the like, described it as best I could with the information I had box. Sure. And that's because you, like me and like Judge Joflat and like the magistrate judge who had this warrant application presented to her, we're not IT professionals. We're legal professionals. And so the facts are, I think we've all gone through this in trying to understand what happened here. They are bewildering and can make your head spin. The magistrate. But the FBI developed this tool. The FBI agents who deployed the NIT are IT professionals. You're saying that the FBI applicant spoke to the magistrate judge in French and the magistrate judge didn't understand French? Absolutely. These are French speakers speaking French to a non-French speaker. Or some third world language. Yeah, I mean, and it just took the applicant's word for it. I, you know, I'm not trying to say that the magistrate didn't try to do her job, but what a job it was. I mean, she had to process a huge amount of very- I've been the magistrate judge. I want to know all about the intermediary and who owns them and all that sort of stuff. Sure. But as you see that, that sort of, that line of questioning can take, eat up a whole lot of time just by itself. The magistrate had to process a lot of information. And the clear information that the FBI provided about the NIT's territorial reach was false. And it put the onus on the magistrate to figure out that the NIT would search outside the district because it never directly said this, this is going to search computers throughout the country. An application for a warrant isn't supposed to be like a sales pitch or a television ad where favorable information is emphasized, unfavorable disclosures appear in small print. If it is, then the person who makes the representations can't rely in good faith on the approval they receive. When you say in small print, it was really in an attachment, right? That described what really was going to happen. It was a separate attachment with a boldface label on it. I want to ask you one question about your good faith argument, because I think that is what this case is really about. Other circuits have weighed in on this. Just last week, I think the Sixth Circuit did. And they found that the Leon good faith exception applies. Is there anything in the facts of this case that distinguishes it from those other cases? The facts are no different at all. What is different, just to address those other circuit opinions, because they're the elephant in the room. Other circuits have not evaluated the good faith question in light of the fact that the FBI agents buried the lead as to the territorial reach, which was the greatest impediment to the potential approval of the warrant application. They buried it. Again, we're referring to it being an attachment, a separate attachment. Well, not only that, Your Honor, because you have this clear opening clear and false opening representation that this would be a within-district search. And then there's this 31-page attachment. Not until the bottom of the 29th page does the FBI even disclose that this would search computers wherever located. A four-page description of the NIT never said, never even included the wherever located disclosure. But it did five different times use the phrase in the Eastern District of Virginia. And that is misleading and yet would have been the inaccuracy of it would have been well understood by the FBI agents. I will reserve the remainder of my time for rebuttal. Can you straighten me out? Bring me out of the woods? I'm just trying to make it simple. Instead of having 15 intermediaries, I just want to use one. Can I use one as an example? You can, Your Honor. Okay. Who owns the intermediary? As the Postal Council said, it could be anybody, usually it's volunteers. The way the network, if we look, if we think back to the game of telephone we played as kids, and let's say you are the activating computer, I am the server, and Mr. Smith here is the intermediary. The way the TOR network works is it routes your communication. Now I said this, I said this to Smith. Right. But as a server, I don't know any of your identifying details without the network investigators. I understand. I understand. You can't find it without being able to trace it. Yes. I understand. But when I'm sending it to him, what's my expectation that my address is not going to be revealed? The way the TOR network works, it masks your address. And so again, without the network investigative technique, we can't find out. No, no, no, no. I understand that. But I have to trust him, don't I, when I send my address to him. I believe so. I want to get to you. Yes. And I know who you are. Yes. Okay. And so I'm sending my address to him. Yes. Okay. And what's the basis of my expectation? I'm drawing an analogy to a pen register. Yes. Do you think that's a good analogy? No, for this reason, and that it is that when the Navy developed this technology back in the 90s, they did so in order to preserve anonymity, unlike the telephone system. And this gets a little outside of my technical expertise, but the system was created to make sure you wouldn't be known. Oh, I understand. I understand that. But the way I look at this whole problem is on the one extreme, you have wiretaps. Yes. Where you're going outside and you're going to be listening to and under the law, that's very sensitive. Right. So the probable cause requirements and exhausting of other means of investigation are extremely important. And then you have minimization. Right. Then you have the other extreme, you have pen register. Right. There's no expectation of privacy in the guy that makes the phone call. His number's going to be revealed. Yes. Okay. And then you have in the middle, you have the tracking device. Right. That's it. That's kind of in the middle between them. Yes. Okay. And so you need it. So the Fourth Amendment has a little more pressure there. Right. Oh, of course you need a warrant. Right. Let's assume you need a warrant for the pen register also. Right. Okay. So I'm back to the it is like a pen register, is it not? With the exception of the intermediary Smith. In that communications are going out to a node. I'm going to send a communication to him that I want to go to you. Yes. Okay. And theoretically, it is possible. And this gets a little outside of my expertise. Could one of these intermediaries be actually listening in on communications? Possibly. That is, those are facts. Well, the intermediary sure knows who I am. Only the first intermediary. And in this situation where they know my address. Only the first. If there are multiple intermediaries, only the first one. Well, let's just leave it to one. Yes. Then yes. He knows my address. That's right. Okay. Then if it tinkers to Evans, the chance that he could send it to somebody else, to somebody else, to somebody else. Yes. But they all he still knows who it is. Yes. All right. That is correct. Turning to the good faith. So I want to know what is the expectation? What? That that he's not going to just that I don't want the risk of disclosing my address. The expectation here, at least your honor, is because from the government's perspective, again, the only way we could have known those identifying information is that we had to go into the computer and force the computer to produce details that would not otherwise have. I understand why you have to have the search warranty in order to get it. I understand that I'm talking about my expectation of privacy. Right. That my address is not going to be revealed. Is the anonymity hardwired into the system like is the first intermediary technologically disabled from disclosing the identity of the sender, if you will? Or is it sort of, I don't know, handshake deal, gentleman's agreement, whatever, that he won't pass along the identity? I say, he, she, it, whatever. My understanding is that it's the former, that there is an algorithm whereby each intermediary only knows the person they got the communication from and where they need to send it to. And ultimately, the way the program works, there is a first person and a last person or a computer and a server. So you just have a chain of intermediaries. That's all. The first one knows who I am. I'm not sure if the first one knows that you are the originating point. The first one may just, the first one may not know if you're an intermediary. Let's put it this way. The user goes to somebody, an intermediary. Yes. And that intermediary knows the address of the question. If I can reserve the rest of my time. One last thing. This is on my nickel. Because I'm not very, you can understand that. I grew up in another world where you use paper and yellow pads. The fact still remains that I disclosed my address to the first, to whomever I send it. Your IP address, yes. IP address. Yes. And to that extent, it is just like a pen register. In part, yes, sir. Okay. And then we have these other intermediaries. Yes. Okay. And so you planted a virus that's going down this route. We would determine a network investigative technique. Well, what do you want to call it? A mechanism for tracing it through the intermediaries. Yes. Okay. So the number of it, I am trying to determine the relevance. How many intermediaries do I know exist? I'm the user. You do not know how many intermediaries. Ah, so it could be just one as far as I'm concerned. Potentially. But I'm sending to somebody and all I know is I'm putting it on good faith that it's going to wind up in the server so I can get the child porn. I believe so, Your Honor. There might be a floor as the algorithm. It might be a minimum of hypothetically five or ten or whatever else. I'm not sure. And I don't think those facts are in the record for that matter anyway. Well, who controls all these intermediaries? Volunteers that want to support the network. Turning, if I can, Your Honor, to the good faith question. The first thing I'd like to state is that appellants are entitled only to plain error. But each of the intermediaries is also a user. Well, a server. Well, I understand, but they're agents. They're my agents. I wouldn't say agents per se, but... Well, I know it's going to go ultimately where I want it to end up. Yes, Your Honor. Okay. And so these volunteers are going to carry it there. Yes. Okay. So, turning to the good faith question first, appellants are entitled only to plain error view on this ground. They never argued below the factual claim first that the FBI engaged in any misleading whatsoever. In fact, both district courts below noted that. And they certainly didn't make the argument that the good faith exception doesn't apply to warrants that are void of an issue. And because appellant has focused most of his time on the misleading, his claim that the FBI misled the judge, I'd like to focus on that first. Appellants have repeatedly claimed that the FBI buried the lead. To the contrary, if you look at the warrant caption, which is the first thing the issuing judge would have seen, it says, in a matter of a search, computers that access the playpen URL. Appellants make much of the statement on the application, which refers to property in the Eastern District of Virginia. Of course, as the Fourth Circuit found, that's the most sensible place to state in terms of the contraband. That's where the playpen server was located. It's where the NIT was installed, and it's where the NIT deployed from. And as a corollary to that, what every activating computer had to reach into in order to get that information. In addition, the fact that the search would be outside the district of the Eastern District of Virginia is on attachment A and attachment B. And here it's worth noting that the appellants are citing literally half the sentence. The sentence that says property in the Eastern District of Virginia continues on with a colon, and then it refers to the attachments which speak of the activating computers. And then finally, it's in the affidavit. It says, wherever located, there was no burying the lead. And also the simple fact that every court of appeal thus far now states, I found the good faith exception applies, is enough to preclude further review because appellants cannot show plain error. Moreover, this was the objectively reasonable reliance on a subsequently invalidated warrant as shown by the fact that each district courts and one court of appeals dissent in the Eighth Circuit would have affirmed this or authorized this device under the tracking device theory. Now, did you seek a tracking device warrant? It is unclear, Your Honor. The form that was used was the standard form. But of course, the choice form does not govern or control a judge's power to issue a warrant. And the good faith question is whether it would be reasonable for an executing officer to reasonably rely on that warrant. And here it was reasonable as not only shown by the fact that all of these courts would have authorized the warrant under 41b-4, but also when we look at the facts, the magistrate judge was in the same district as the playpen server where the NIT was, and thus it was reasonable for the agents, who we do not expect to understand the legal nuances that judges would, to defer to her determination. And to the extent there was uncertainty, in fact, the agents did what we want them to do. They put that uncertainty in front of a judge. They obtained the judge's blessing, and only then did they execute the operation. They did not make a wholesale determination by themselves. And to the extent that the magistrate judge was wrong, and it appears to be, at worst, a genuine misunderstanding about the extent of her territorial reach, again, that is not on the agents, and there's no misconduct to deter. There's also no appreciable misconduct to deter in this case, because rule 41b-6 now specifically authorizes these types of acts. Back to the First Step Act in the first case, where 41b-6 postdates your case, I think that could cut either way. Either it says, as we discussed in the first case, that as a policy matter, there's no bad conduct to deter, or we had to fix this problem that existed in the NIT cases for cases going forward, and so you're stuck with a universe in which 41b-6 doesn't exist. Well, Your Honor, the government's position is still that 41b-6 clarified the ambiguity in 41b-4, and certainly there was no case to the contrary or provision to the contrary that said that NIT warrants couldn't be authorized under that rule. But even if that is not the case, again, the question is appreciable deterrence. And there was no, as appellants claim otherwise, there was no short-circuiting of the rulemaking process or anything else. Again, to the extent there was uncertainty, the FBI did what we want them to do. And with that, if the court has no further questions. I have a question. I vaguely recall what was in the motion to suppress, but put that aside. Was there an argument made in the motion to suppress that Taylor had an expectation of privacy in the non-disclosure of his address? That simple little point. I believe so, Your Honor. All right, and why? For the reasons I had mentioned. No, no, no, no. Back to my hypothetical. Because he could rely on the intermediary? Not for that. They didn't talk about intermediaries. I don't believe so, Your Honor. I would have to look. I don't. Well, wouldn't that be indispensable to the expectation of privacy? It would as far as it would disregard that it would put away with the third party disclosure doctrine. Yes, Your Honor. You know, I would get on moving it out of it, put it into the electronic media. I'm I'm a huge drug dealer. Yes. And I want to get information by wire to the supplier in Los Angeles. And I go through people to do that. Yeah. Yeah. And I might make a communication. You would. And in the traditional sense, again, Your Honor, I would agree with you. It is simply the fact that this uses the tort. Well, wouldn't you think? Well, how do you prove to have an expectation of privacy? You've got to show the circumstances, don't you? Yes, right, Your Honor. Well, what was shown? What was shown so that a court can say he had an expectation of privacy in a Fourth Amendment sense that the address wouldn't be disclosed? Well, one of the things to note, Your Honor, is even if the IP address would not be disclosed and I'd have to look at that precise point. That's what I'm talking about, the IP address, which which can be. That's like that's like a phone number. Yes, Your Honor. But simply because it exists out in the ether like a phone number doesn't actually mean the government would be able to find it. No, no, no. I understand that. But when the government can't find the caller on the pen register either without the tap. Yes, Your Honor. And I see that my. No, you're on my nickel. Yes, Your Honor. You understand my concern. I do, Your Honor. And if Your Honor wishes. My point is this. If there's no expectation of privacy, there's no violation. Would you agree? Yes, Your Honor, I agree with that. OK. And if Your Honor wishes for further submissions, we are happy to submit a 28 day memorandum. I think we'll ask both sides to submit the expectation of privacy memorandum with, let's say, 10 days. Certainly, Your Honor. You know, the clerk will write both sides. All right, Mr. Smith. Thank you, Your Honor. I will try to roll through a few topics as quickly as possible. First, the government, the government's argument. This is subject to only plain error. Review is incorrect. The argument for this, that the good faith exception shouldn't apply that we're raising is simply an argument about whether the district court should have granted the remedy that we sought from the outset. An argument for suppression is by nature an argument that suppression will result in appreciable deterrence that outweighs the cost. And inherent in that is the notion that something has been done that ought to be deterred. It seems to me that increasingly the Supreme Court's decisions in the exclusionary rule and good faith sort of universes have converged and that they're sort of flip sides of the same coin. I mean, everything's about, you know, sort of was this intentional or reckless? And is there something to deter here? Is that right? I think that's absolutely right. And, but as far, just to briefly return to the, I mean, well, to finish answering your question, I think probably good faith exception made sense when Leon was written 25, 35 years ago. But it probably now would make more sense to call it the deterrence exception, frankly. But beyond that, the plain error argument is kind of hard for me to respond to because the government has never offered any authority for the proposition that the admission of evidence over objection with grounds stated is ever not preserved. They simply have provided no authority for that. And I don't believe there is any. Can I ask you just a quick question? So you say in these days, it's better termed the deterrence exception than the good faith exception. I guess what I'm getting at is before you get to any exceptions to an exclusionary rule, is the exclusionary rule today better termed a deterrence rule? It's not sort of an automatic remedy that follows. If there is conduct to deter, then there is exclusion. Forget about good faith. And then maybe they're the exact same thing, exclusionary rule and good faith exception. But it's not really a deterrence exception. Isn't it a deterrence rule? That's another way of looking at it, I suppose. It has been stated as something where the government has the burden of showing that there is good faith or whatever you want to call it. But as far as the revision of the rule and the argument that that eliminates any deterrence justification here, information technology has advanced and spread to permeate our everyday lives. This revision to Rule 41 is not going to be the last made to embrace new technology. It's not going to be the last one that takes longer than the FBI and DOJ would like. The need to deter, the deterrence imperative here is the need to deter law enforcement from trying to get ahead of the law. I think I've run out of time here. I think we understand your point. I appreciate your time. Thank you. Oak Grove Resources versus.